Thank you for joining us this morning. I should note that I'm here in the courtroom with Judge Chin. Judge LaValle is participating remotely, so you will see him on the monitor at the podium. We have five cases on the calendar for today, one of which we're taking on submission. The case on submission is number 21-1676, Gillette v. Burlington Police Department. And so with that, we'll move to our first argued case, number 21-868, Ali v. Westchester Medical Center. Mr. Sadowski. Robert Sadowski Good morning, Your Honors. May it please the Court, my name is Robert Sadowski, and I represent Plaintiff Dr. Amrul Ali. You know, you can raise that if you want, but I think you need to speak up a little bit. The lower court granted summary judgment to the defendant, New York Medical College, and Westchester Medical Center, that defendants did not discriminate against him when it promised but denied him a residency position due to his age and foreign origin. There are several genuine factual issues in dispute, which the lower court either decided... Robert Sadowski So you just used the phrase foreign origin, and just is the claim that he was discriminated against because he was Egyptian or because he was not an American citizen? Robert Sadowski Because he was not an American citizen. Robert Sadowski Not an American citizen, okay. The lower court either decided or formed a decision based upon defendant's factual assertions. First, the lower court got the timeline wrong so as to not temporarily in time associate what the lower court characterized as stray remarks with the adverse action. Ageist remarks by Dr. Wandel, the residency program director, the deciding official in the case, occurred in November. The first adverse action was on December 6, 2016, when Dr. Wandel said, as we assert falsely, Dr. Rosenberg, a resident in the program, reported that Dr. Ali would not work smoothly with other residents. Robert Sadowski So you think Dr. Wandel lied about the report from the residents who interviewed Ali? Robert Sadowski Yes, we do. There's evidence in the record that Dr. Rosenberg was not present, did not interview, and was at Metropolitan Hospital performing surgery. Robert Sadowski He was in charge of reporting the consensus view of the residents who conducted the interview, right? Robert Sadowski That's what Dr. Wandel asserts. Robert Sadowski Is there any evidence to contradict that, that Dr. Rosenberg was simply recounting what the others had said? Robert Sadowski No. Dr. Wandel testified that on December 6... Robert Sadowski My question was, is there any evidence to contradict that fact? No, there is no evidence, or what? Robert Sadowski To believe that Dr. Rosenberg was, and did interview, and did report on Dr. Ali... Robert Sadowski There is. How can you say there's no evidence? There's his own statement that he did. That is evidence. I mean, it could be false, but that is evidence supporting that he did. Robert Sadowski I understand, but our assertion... Robert Sadowski Yes, he did. Robert Sadowski And so it would be a matter, of course, that there would be a report of the interviewers. Robert Sadowski Yes, and the defendants claim that those reports are destroyed or don't exist. Robert Sadowski So the idea is that they filed a report that was positive, and then Wandel replaced it with a negative report, or at least disregarded the actual report, and then... Robert Sadowski And then what's the adverse action? The adverse action is putting him on a lower rank in the match. Robert Sadowski That's right, and to deny... Robert Sadowski Now, wasn't Wandel responsible for Ali having an interview in the first place? Robert Sadowski Yes, yes, he was. Yes, he was. He was promised a residency position, and following through on that, he was granted an interview. Robert Sadowski But then the sole reason given not to accept him into the residency program was the report that Dr. Rosenberg said Dr. Ali would not work smoothly with residents, Robert Sadowski and he was too far out from his internship program, which a jury could infer was a time issue and an age issue. Robert Sadowski May I ask you for a clarification? When speaking about the timeline wrong, you said that something happened in November. What is the it that happened in November? Robert Sadowski In November, Dr. Wandel made a series of statements about Dr. Ali in reference to his age, whether he could wake up in the middle of the night to take calls. Robert Sadowski I have looked at those, and in this I'm missing something. I do believe that the other conversation that you had about Dr. Sharma and Wandel talking raises an age issue, but if I'm correct about what was said in the one you're talking about now, Robert Sadowski Dr. Wandel said, as quoted by the plaintiff, he was referring that people concerned and his concern, if I get a phone call in the middle of the night, will I wake up? Because you know, you know. Do I have that correct? Robert Sadowski Is that what he said? Okay. So that is not an ageist remark. It doesn't refer to age at all. I mean, it is a real concern whether a person will wake up when he gets a phone call. And this was expressing concern about the plaintiff. Will he wake up in the middle of the night? But it doesn't say, it doesn't say that they're drawing an inference because he is X number of years old, about 45. That means he won't. They're simply referring to a legitimate concern. You're the one who's associating it with his age, not, it didn't, there was no mention of age. Well, looking at the totality, Dr. Wandel did say to Dr. Sharma, Dr. Ali looks old. I agree with you. I agree with you. You're now talking about a different conversation. And I agree with you about that other conversation. I agree with you that there's no question that other conversation raises ageist concerns and provides some evidence of age discrimination. But the one that we were just talking about a moment ago was simply expressing concern about whether he would wake up in the middle of the night. And there's no reason to assume that that was because of an assumption about his age as opposed to having observed him and see him as a human being and saying, is this somebody who's going to wake up in the middle of the night? But I think what the court is required to do is to look at the totality of the circumstances. And it is a circumstantial case. And in these cases, when you put together the comment about he looks old. The comment was he looks older than he is, right? The comment is he looks old. And Dr. Sharma responded, he looks older than he is. You're saying that in light of the later statement, we should understand the comment about waking up in the middle of the night to be about age. Yes. Even though as Judge Lavelle points out, it doesn't necessarily refer to that. It doesn't necessarily. But when you look at all the circumstances involved in the statements, all the circumstances. So while Wendell had made these two comments, he was also pushing Ali through the process, right? He's the reason that Ali got an interview, as you acknowledged a moment ago. So why? So how does it make sense that he's responsible for getting him the interview, but then he would sabotage the results? Well, I think you're going to have this easier not to get him the interview than to discard the report of all the interviewers and fraudulently rely on the fictitious report. I think the answer to that is Dr. Wendell was following through on the promise, but ultimately his ageist views overcame the promise that Dr. Sharma admits everyone knew about and was made that he would obtain the residency. Well, the fair inference of the second conversation between Sharma and Wendell is that Wendell is rebutting the concerns of – I'm sorry. No, I'm sorry. I take it back. Sorry. Go ahead. And what's the context of the second remark? Why does Wendell say he looks old? Why? In what context? How did that come – Just in conversation, Dr. Sharma testified that they discuss age and families and all the characteristics of the residents. So your argument is that Wendell – so Wendell had worked with Ali because Ali was volunteering at the medical center, right? Actually, Dr. Ali worked for Dr. Sharma. But Wendell knew him. I mean, that's why he's making this promise, right? They were acquainted and – So despite knowing him, you're saying he liked him to some extent and therefore was getting him the interview, but then some kind of deep-seated hostility toward him on the basis of age overtook his other impulse and led him to sabotage the interview. The defendants were obtaining great, prestigious academic research from Dr. Ali. I don't think they wanted to lose that. They needed it. They had been on academic probation for lack of academic research. They promised Dr. Ali, you provide good research for us and we'll get you your residency. If Wendell had not pushed for an interview, it would have appeared to Dr. Ali that they were pulling the wool over his eyes and getting him to work for free without ever having the expectation that he would obtain the residency that he was promised. They got three years. Can I ask before you sit down to talk about national origin discrimination? Yes. So you have these statements about age, but is there anything in the record that indicates animus on the basis of foreign citizenship status? The record is clear that foreign and American medical graduates are to be treated the same. They have the same rules about when to take step three of the U.S. medical licensing exam. Dr. Bierman, once he, once it was the second opening off match, Dr. Bierman got Dr. Ali's papers and credentials and looked at them and said, oh, he's a foreign medical grad. I want him to pass step three. That is not a requirement. Does that rule apply also to Americans who were at foreign medical schools? In other words, the issue was whether you attended an international medical school versus an American medical school. And regardless of citizenship, if you attended a foreign medical school, you had to pass step three first. That's not the rule. That was, quote, Bierman's rule that was made up specifically to put a hurdle in front of Dr. Ali. Well, your point is that there are written policies or some official policy somewhere of the New York Medical Center is that the step three needs to be completed by the end of the second year of residency. Yes. But Bierman told Ali that it had to be completed before he applied for residency. Correct. Now, I understand that that might be a misstatement of the official rule or the formal rule, which actually, let me just ask, where is the formal rule codified? Is there a document somewhere? Yes, it's codified in the ACGME guidance, which says that treating American and international medical graduates differently may constitute harassment. I understand that, but where did the New York Medical Center codify the idea that step three does not need to be passed until the end of the second year of residency? In two places. In the agreement between Westchester and its residents, and in its policies that residents must complete their exam for step three before the end of the second year of residency. Okay, so there's a policy somewhere. It's also codified with New York State. So there are four places where it is codified. Okay, so it was available to know what the rule was, and Bierman misstated the rule. I guess I'm asking, what's the evidence that he did so on the basis of Mr. Ali's national origin as opposed to some other explanation, like he made a mistake? There was no other basis to impose that condition upon him. He's Egyptian, he's a foreigner, and he went to an international school. A jury could certainly find that imposing that restriction on Dr. Ali without ever having informed him of it was discriminatory animus based upon school status. I mean, Wandel called him and said you need to pass the USME, and he had this meeting with Bierman where he said he needed to do it. In fact, Wandel called him and said you needed to pass the exam because I have an opening that you might be able to get, right? Yes. That's informing him of it. So the problem is not that he wasn't informed. The problem is that you think that the requirement was not justified. No, he was not informed of it when he applied through the match before that. The hurdle was placed before Dr. Ali a month later when he applied off match when an opening in the residency became available. Right, I understand that. So can I ask, does it make a difference? So I understand that one of the residents that the New York Medical Center hired was a Jordanian and so also a foreign citizen, but they gave him a position, and he did pass the exam in advance. So does that indicate that maybe it's not about animus? Maybe they had this requirement that they might have modified or misstated? Different decision makers. Dr. Al-Shawiki was a Jordanian who had worked with the brand new chief or chair of ophthalmology, and she specifically brought him into the program and created a position for him. Okay, I understand that. All right, we've taken you over time, so let's hear from the FLE. Thank you. But thank you for your argument, Mr. Sadowski. Mr. Millis. Yes, Your Honor. Thank you. May it please the court. On page eight of the memorandum submitted, the brief memorandum submitted by counsel for the appellant, I think it's telling and kind of sets the tone, I think, of this whole case from day one, legally and factually. Dr. Ali, he writes, did not solicit the faculty position at WMC-NYMC. Dr. Ali was gainfully employed at NYU, a highly regarded medical institution compared to WMC-WYMC, which has a low rating among medical schools. And in fact, had been on academic accreditation probation with the ACGME. So it made no sense for Dr. Ali to move from NYU to NYMC to work for free without receiving a coveted residency position. This case from day one was about an alleged breach of contract. It was an alleged breach of contract where Dr. Wandel and Dr. Sharma, who certainly benefited from the academic expertise of Dr. Ali, which we will not take away from him. He was good at what he did. Helped get grants, wrote papers. He was good. A man who had graduated many, many years before and had not gotten a residency since then, despite several efforts to do so. This was, I think, drawing the appropriate inference, his last chance. His last chance to go to a substandard medical school associated with a county medical center in the hopes of getting a very, very coveted residency position. It's clear the record reflects it. No one disagrees that the ophthalmology residency position is very, very coveted. So that's what he did. And he worked hard, voluntarily, without pay, helping out Toro where he could. Then when it went wrong, for all sorts of reasons, council likes to talk to the totality of circumstances, which is a perfectly accepted principle in the law and makes great sense when you can't establish a bright line test. But it can be abused because it becomes the refuge of those without any evidence. They point to the shiny object here or the shiny object there and say, let's look at the totality of circumstances and get to a jury. So let me ask you this. Let me ask you this. That's all very well what you're saying, but I don't see how it's escapable that the conversation reported between Dr. Sharma and Dr. Wandel exhibits is reasonably interpreted to exhibit age bias because it refers to age. They talked about the fact that Ali was older than the current residents. And and they went on to say they went on to say, we talk about his age. And, you know, you have to understand that the rest in the in the context of talking about his age, this is like a 24 hour job. We talk about his age. How old is he? They discussed how old is he? And and Sharma said he's not as old as he looks to Wandel. How does that not how is that not a evidence, evidence of of drawing the inference that a person's ability to do the job is dependent on age? Several reasons, Your Honor. We all know that making remarks in the workplace has become a dangerous, dangerous thing today. No, no, no, no, no. Don't go down that road. This is not just people making remarks in the workplace. This is people who are responsible for the decision whether or not to bring him into the program. And they're discussing him in precisely the context of whether he's going to be hired. And they're talking about is he somebody who can be who can be counted on to be a proper resident when he is so many years of age in view of the fact that residency is a 24 hour job. This is not just casual, casual remarks in the workplace. We could agree to disagree there. But respectfully, these are not the players who ultimately would get him the position by any stretch of imagination in the match program. It's the other residents who eventually evaluate him. In 2018, it was Dr. Kelly Hutchinson. So, so again, I understand if you want to take that approach and look at these comments and say they were made by quote unquote policy makers and therefore carry more import and more weight than someone just making a stray remark in the workplace, which I respectfully submit it could still be even if it's from a policy. So who were the decision makers in 2016? So my understanding was that even though there was an interview with the residents, one deal was actually responsible for putting in the ranking. Is that right? Well, based upon actually ranked Ali as part of the match program, it was put, but it was up. It was a complete process. My recollection of the record of all of the residents, and he was part and parcel involved in making that mathematical ranking where he simply didn't add up. He had no final control over. Well, Mr. Sadowski says that his allegations are that Mr. Wandel disregarded the report from the residents and put him at a lower rank than he otherwise otherwise merited because of bias. So what in the record tells us that that's not true? What in the record says that it's supported by anything? It is complete, sheer speculation and goes against the grain of one question that you asked, Your Honor, and that is, this was a man who supported Dr. Ali to accept that, that there was this plot in order to make sure he didn't get this position. We should take the evidence that's in the record that indicates that Wandel is responsible for getting the interview in the first place and infer from that that he would not have disregarded a positive report for the residents. It's certainly a reasonable inference. Let me add something else. I'm looking at the exchange, the deposition of Dr. Sharma. Yes. Where he talks about the plaintiffs looking older than he is. If you keep going, he's asked, Dr. Sharma's asked flat out whether age was considered. And his answer was age did not come into that if age was the reason Dr. Wandel would not have offered the position. So doesn't that put a different spin on the question? No question. Look, I think what we do is we conflate age and the length of time that he's been out there since graduating. Of course, one gets older with age. One also doesn't use the skills that one usually does when doctors go through a normal course of action, obtain a residency within several years after graduating. Dr. Ali made a choice, and he said it on the record. He figured his best way of getting a residency was to become essentially an academic, go from place to place, obtain fellowships all over the place. And again, he's qualified, he's a bright man. But that was his choice. And all that time passed. I mean, if in fact the New York Medical Center discriminated against him on the basis of age, the fact that he made that choice wouldn't excuse the discrimination, would it? No, it wouldn't have excused discrimination. I'm just saying there's no basis for saying that his physical age had anything to do with any decisions that were made by any true decision maker in connection with that. And let me get to the- Okay, so the reason why you think it's implausible to infer from the remark about his age that the match was manipulated specifically is because the process was that the decision was really of the other residents. And it's implausible that Wandel would have discarded a positive report from the other residents and manipulated the match. No question. After obtaining Mr. Ali, the interview in the first place. He wouldn't have done it. I agree. So that's the argument. It's part of it. It's part of the whole argument. Well, what's the rest of it? Well, here's one. Counsel just argued motive. He just argued motive on behalf of his client. And what he said was they didn't want to lose Ali. Either Dr. Wandel or Dr. Sharma wanted to lose Ali because he was very valuable, he was free, and he was providing a valuable service in terms of research and grants. Now, one may sit here in judgment and say, gee, that doesn't seem fair. Of course, Dr. Ali is certainly free to break off that relationship at any time if he feels he's being used. But in the end, if that was the motive, which was just said to you in argument, that's not a discriminatory motive. It may be a selfish motive on behalf of Dr. Wandel. Well, that's not discrimination, but I think that Mr. Sadowski made that argument to explain why Wandel would have helped Ali obtain an interview and then sabotaged the hiring because they thought they were getting some benefit from him but didn't actually want to give him a full-time job because of the age bias. Understood, Your Honor, but there's the key. Is that discrimination as a matter of law? If one who has some input, assuming for the purposes of our argument, assuming our guendo, as we say, if one has input, if one can help make that decision or force to completely make the decision, but the decision is made for the selfish reason of keeping someone in the department having nothing to do with the man's age, having nothing to do with the man's national origin, then is that discrimination in the workplace? And my answer to that would be no. The issue before us is not whether they practiced age discrimination or national origin discrimination. The issue is whether the record contains evidence which would be sufficient for a fact finder to reasonably find that fact. There are lots of arguments against there being age discrimination or national origin discrimination, but the question is not whether those are good arguments or whether they should prevail. The question is whether there is evidence that a fact finder could reasonably find sufficient to support his claim. I leave you with this, Your Honor. And look, you're absolutely right that we see in the law and the cases of Legion where they say that it's difficult for the court to determine on summary judgment a discrimination claim. But they do. They do from time to time. I believe that the lower court in this instance meticulously went through the record, examined all of these instances that have been pulled out of essentially nowhere to support a claim for discrimination either based on age or national origin when in fact the case was all about from day one an alleged breach of contract, which of course was not actionable. So give me your concise answer as to what is the explanation why the passage involving the conversation between Dr. Sharma and Dr. Wandel, why that passage does not supply evidence that a fact finder could find sufficient to support the claim of age discrimination. One, based upon the totality of circumstances, there is zero likelihood that Dr. Wandel would ever discriminate against him based on age when in fact he was one of his primary supporters. Number two, temporal proximity. In terms of the time that it would take, the time that the actual decision was being made by someone other than Dr. Wandel, it just doesn't match up. I understand a comment can be made and one can sit here and say, gee, that's an important comment. And I'm not going to argue that. It's a matter of viewing the statement itself. What I'm saying is when you put it in the context of what was going on at the time, it is no jury could reasonably determine that they were trying to discriminate against a man who they were trying to promote. And they were trying to promote. Maybe they changed their mind because he was so good. But they were trying to promote for residency, although they had no power or very little power. Okay, can I ask you about the next vacancy? So was the residency position that Dr. Al-Shuaiki was hired for, was that the same one that Ali was seeking in 2017 or was it a different one? Different one. So it was a different position? Right. But do you think that the hiring of Dr. Al-Shuaiki says something about the national origin discrimination claim? Not at all. What it says is Dr. Hutchinson had somebody she liked working with. She trusted. He's Jordanian. We're not talking about the difference here of national origin of Egyptian and Jordanians here. The fact is she hired someone she liked. I'm sorry. That's not the first time that's happened in the workplace. Okay, I understand that. So then for that vacancy that Ali applied for, the 2017 one, was he, in fact, rejected because he didn't pass step three of the licensing exam? Well, that was part of it. They wanted him, and the reason we go back to that is, yes, there is a rule that they could pass the step three two years within the term of their residency, no doubt. The question is, as you sit here today, should the court sit in judgment on a decision based upon the facts, based upon his low scoring in test scores, based upon the long period of time that he had graduated, actually having serious clinical practice in an area that is highly, highly competitive, that it was, in fact, wrong for them to say, look, pass your step three, so that passing the step three, quite frankly, might help him get further consideration. In some sense, they were doing him a favor. You're saying that they didn't impose it as a requirement. They told him it would help your application to pass step three. No question. But did they not say to him you need to pass step three before starting a residency or even applying for a residency at the medical center? It wasn't a de jure statement. This must do this to get that. It was a statement that this would be helpful to what you can do, and they wanted him to do that. And the fact that he didn't still doesn't make it de jure. In the end, he didn't pass step three as they requested that he do so, Your Honor. Did they consider his application nonetheless? Or was it not considered because he had not passed step three? I'm trying to recall, Your Honor, my apologies for that. I believe there was some consideration going, but I cannot be quoted on that, and I apologize. I don't recall from the record. Okay. Okay? Well, unless there are further questions from the panel, thank you, Mr. Millis. Thank you. I don't have a record that Mr. Sadowski reserved time for rebuttal. Is that correct? Oh, he reserved two minutes. That's not on my paper. Okay, Mr. Sadowski, we'll hear you on rebuttal for two minutes. Thank you. So one thing I would appreciate your covering on your rebuttal is your adversary said that Wandel and Sharma were people who had no role in the question whether he would be hired as a resident. Is that correct? Or is there a basis for believing that they did have a recommending role that could be significant? Wandel, according to ACGME rules, was the designated program director. He is completely in charge of who is selected and who is ranked for the residency program. But he's completely in charge. I mean, you don't dispute that their ranking needs to reflect the feedback of the residents who conducted the interviews, do you? Oh, no, absolutely. So your argument is that he sort of performs a ministerial function where he enters the ranking, but it would have to reflect the view of the residents, right? Yes, that's right. So your argument is not that he could make the decision. Your argument in this case is that he sabotaged the decision making. Yes, Wandel did sabotage. So it's more than him having a bias and being able to make a discretionary decision about whether to hire somebody. It's that his bias was so deep-seated that he violated the procedures by discarding the recommendation of the residents and ranking Mr. Ali lower than he was entitled to be ranked if it were, you know, a faithful execution of the procedures. That's absolutely correct. And what is odd— Now, to show that he was willing to do that, wouldn't that have to be a really deep-seated animus? Maybe. I can't speak to the extent of his animus, but we can certainly see that it is a significant factor here. And what is interesting— Are you saying—I'm not sure I understood where you come out. Are you saying that his only role with respect to who would get the residency was that he was supposed to pass on what the residents who he had interviewed said, or did he have any role in terms of his own input to make a recommendation favorable or unfavorable? He had before him the interviews of two doctors, Dr. Zeidman and Dr. Davey from Metropolitan. And we don't know which residents actually interviewed him, but it was not Eric Rosenberg. So if your position is it's not Eric Rosenberg, but you don't know who it is, why are you so confident that it was a positive interview that Wandel then discarded? Rosenberg and Ali were friends. They worked together under Dr. Sharma. He had the deposition testimony of Dr. Wandel, and he clearly testifies that Dr. Rosenberg was the preselected representative and that he was reporting what the others had thought, what they had told him. He was a representative of the residents. The statement comes as a summary of the residents' judgment of their interviews with the applicant. And the judgment was that he would not work smoothly with the residents. The teamwork was important. I mean, is there anything to suggest that that was a fabrication? Yes. There's a text message of Dr. Rosenberg saying, I wasn't at the interview. He's not suggesting that he was there. He collected the comments and is reporting them. No, because he was not at. What evidence is there that either he lied when he reported to Dr. Wandel or that Dr. Wandel is lying and making up this whole thing about what Dr. Rosenberg reported? There are text messages denying that he was at the interview, denying that he made a bad recommendation. He doesn't contend that he was at the interview. And asserting to Dr. Ali that Dr. Wandel lies. There are so many irregularities in this selection process. For example, Dr. Wandel, although it's his position as program director to decide on residents, he abrogated that responsibility to Dr. Berman, who may have had some responsibility over residents. But that responsibility over ophthalmology residents was removed between May 17th and July 1st, 2018. I think we understand the argument about the irregularities. Can I just ask you one question before you conclude? So Mr. Millis was suggesting that this is really a breach of contract case because Mr. Ali thinks he was promised a residency that he didn't get. So why didn't you bring a breach of contract claim? The breach of contract claim would recompense the plaintiff for three years as being a researcher. And that doesn't seem to make Dr. Ali whole in this situation of discrimination. He was promised a residency and it was derailed by both age and national origin. Okay. I think I get that argument. Thank you very much. Thank you, Your Honor. The case is submitted.